UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| JONATHAN SANDLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 4:08-cv-0047-DFH-WGH |
| | ) | |
| SWITZERLAND COUNTY SCHOOL | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Jonathan Sandlin attended a Switzerland County School
Corporation (SCSC) high school between August 2004 and August 2007.  While
at school in the fall of 2005, Sandlin suffered two epileptic seizures.  After the first
seizure, SCSC had Sandlin stay home for ten days.  During Sandlin's second
seizure, SCSC called the police for help.  Officer McCoy of the Vevay Police
Department arrived and injured Sandlin's shoulder.[1]  Sandlin quickly returned to
school but was expelled from school in the spring of 2006 and again in the fall of
2006 before he finally withdrew for the last time in August 2007.  Sandlin has
sued SCSC for discrimination based on his epilepsy in violation of the Americans
with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 *et seq.*, and the
Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*  Sandlin also alleges two tort

---

[1]Sandlin has filed a separate lawsuit against the Town of Vevay in state
court based on the injuries he suffered in the encounter.

claims against SCSC for negligence under Indiana law.  In the first, Sandlin claims that SCSC was negligent in its response to his seizures, resulting in injury.  In the second, he claims that SCSC failed to ensure he received an education.

SCSC has moved for summary judgment on all claims.  SCSC argues that Sandlin failed to exhaust his remedies under the Individuals with Disabilities Education Improvements Act (IDEIA), failed to offer evidence he was disabled under the ADA or Rehabilitation Act, and failed to offer evidence of discrimination because of his disability.  On the Indiana tort claims, SCSC argues that Sandlin was contributorily negligent and thus is barred from recovery under Indiana law.  SCSC's motion is granted on all claims, but Sandlin should have an opportunity to decide whether he wants to assert a claim under the IDEIA.  Under the circumstances here, where Sandlin and his parents never received any notice of their rights under the IDEIA, Sandlin was not required to exhaust administrative remedies under the IDEIA.

I.      *Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate when there are no genuine issues of material fact, leaving the moving party entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party must show there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only genuine disputes over material facts can prevent a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the suit under the governing law, and a dispute about a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.*

II.   *Facts for Summary Judgment*

The court sets forth the facts in the light most favorable for Sandlin, the non-moving party. Most of the facts set forth below are taken from deposition testimony of Sandlin and his mother, Vickie Graziani. Sandlin was born in 1990 and lives in East Enterprise, Indiana. Sandlin's first epileptic seizure occurred in April 2004 after he finished riding his bike or playing during spring vacation. Sandlin came into the kitchen of his home to get a drink. Sandlin's father then saw him fall to the floor but thought he was joking. Sandlin's father rolled him over and saw that his chin was bleeding and that he would not wake up. Sandlin was transported to the hospital and received stitches for his chin.

Sandlin had several seizures while in middle school. During each seizure the school called paramedics and had him transported to the hospital. A doctor

diagnosed Sandlin with epilepsy and prescribed medication to control the seizures.

Sandlin began high school in the fall of 2004.  During the middle of his ninth grade year, he suffered a seizure at school.  He was taken to the nurse's office and was then transported to the hospital.  At the beginning of his sophomore year, on Wednesday, August 24, 2005, Sandlin had another seizure at school.  Sandlin's brother, John Jr., was called to the nurse's office.  Sandlin was there on a stretcher.  The school's male staff, the paramedics, and the police were called to assist.  Sandlin started to thrash his arms as he came out of the seizure.  The male staff and the paramedics held Sandlin down; one of the teachers cut his arm in the scuffle.  The paramedics transported Sandlin to King's Daughters' Hospital.  Sandlin's thrashing broke the cloth restraints holding him down and dislodged three intravenous lines.  Ex. F at 23.  Hospital security officers and paramedics had to assist in physically restraining Sandlin.  *Id.* at 39.  King's Daughters' Hospital then had Sandlin transported by helicopter to Children's Hospital in Cincinnati.

Sandlin returned to school on Friday, August 26, 2005, and the school nurse followed him to his classes.  At the end of the day the school convened a section 504 plan meeting.[2]  The meeting was attended by Sandlin, his brother, his

---

[2]The reference is to section 504 of the Rehabilitation Act of 1973, PL 93-112, codified as 29 U.S.C. § 794.  A section 504 plan is intended to ensure that a

(continued...)

mother, a high school counselor, Principal Marshall, and Nurse Lucas.  The group developed a plan for handling Sandlin's seizures.  The group agreed on the following protocol:  If Sandlin had another seizure, his brother was to be present, his parents were to be contacted, an ambulance was to be called, Sandlin was not to be held down, and the police were not to be called.  The section 504 plan also allowed Sandlin to carry water to class after he presented SCSC with a doctor's note.

At the end of the section 504 meeting, Principal Marshall told Sandlin, "I'm sorry, but we're gonna have to put you out of school for further notice until we get proper training of how to handle epilepsy."  Sandlin Dep. 87.  After the section 504 meeting, SCSC Superintendent Caddell overruled the portion of the plan saying the police should not be called.  Graziani Dep. 60.  Principal Marshall later told Sandlin's mother that Caddell decided to call the police to protect the school staff and to make sure no one was hurt.  *Id.* at 68-69.  Sandlin's parents were not informed of this decision at the time it was made.  While Sandlin was out of school, a person came to the school to provide training in how to deal with a person experiencing an epileptic seizure.  Complaint ¶¶ VI-C-6,VI-E-1 and -2.  The school did not call Sandlin back, but after two weeks, Sandlin's mother called the to see if he could come back.  The school told her that would be fine.  *Id.* at 92.

---

[2](…continued)
student with a disability is able to participate in programs receiving federal funds.

About two weeks after his return, on September 28, 2005, Sandlin had another seizure at school.  Sandlin's parents were contacted.  When they arrived, Sandlin was on a gurney in the nurse's office.  The nurse's office was crowded with many people:   Nurse Lucas, a school secretary, the paramedics, Superintendent Caddell, Vice Principal Dunning, Sandlin's brother, and two student nurse helpers.  The police had been contacted pursuant to Caddell's decision.  The paramedics then began to wheel Sandlin out of the school.

Sandlin was being pushed out of the lobby when Officer McCoy ran into the building, grabbed Sandlin's right arm, put his foot on the gurney, and pulled. Graziani Dep. 60-61.  Sandlin's right shoulder was injured and required surgery. Sandlin Dep. 79-80.  No school staff members restrained Sandlin during this incident.  Graziani Dep. 66.  Sandlin returned to school shortly after this incident.

Months later, in March 2006, Sandlin was walking back from lunch when a teacher told him he was going to be late to class.  Sandlin Dep. 8-9.  Sandlin told the teacher to write him up, and they got into an argument.  Sandlin was expelled for the rest of the school year because of this incident.  *Id.* at 12-16.

Sandlin returned to school in the fall of 2006.  Upon his return, he felt that another student was harassing his sister.  *Id.* at 20-26.  He told the student to stop.  The other student threatened to kill Sandlin, and Sandlin responded by punching the student in the face.  A teacher tried to intervene by grabbing

Sandlin's arm, but Sandlin pulled away.  Sandlin and the teacher fell to the ground.

SCSC tested Sandlin to determine if he had a learning disability that might have caused his behavior problems:  SCSC determined that he did not.  But SCSC did not inform Sandlin or his parents of their due process rights to appeal its decision that he did not have a learning disability.  *Id.* at 31.  Because SCSC determined that Sandlin did not have a learning disability, he was expelled for the rest of the 2006-07 school year.  *Id.*

At the beginning of the 2007-08 school year, Sandlin withdrew for a final time as a result of many instances of harassment because of his epilepsy.  *Id.* at 119-20.  Sandlin had been picked on more times than he could count.  *Id.* at 124. For instance, in August 2005, a student had grabbed Sandlin by the neck and said he would pound Sandlin so hard he would have another seizure.  *Id.* at 120. Additional facts are noted below as needed, keeping in mind the standard for summary judgment.

III.    *The Individuals with Disabilities Education Improvements Act*

The Individuals with Disabilities Education Improvements Act and its predecessors (the Education for All Handicapped Children Act and the Individuals with Disabilities Education Act) have provided federal funding and a substantive

right to a free appropriate public education for children with disabilities.  The central provision of the IDEIA is the individualized education program or IEP, a customized plan developed by a team of educators in consultation with parents and tailored to the individual student's abilities and limitations.  The IDEIA imposes elaborate procedural requirements on schools to ensure that parents are involved in decisions concerning their children's education, including allowing parents to examine their child's records, giving parents written prior notice that explains the procedural safeguards available to them, allowing parents an opportunity for mediation, and allowing parents the opportunity to present complaints and to have an evidentiary due process hearing.  20 U.S.C. § 1415.[3]

As a general rule, before a plaintiff can file a lawsuit under the IDEIA, the plaintiff must exhaust administrative remedies under the Act, including participating in an impartial due process hearing and appealing an unfavorable decision from the impartial due process hearing to the state educational agency. 20 U.S.C. § 1415(f)-(g); *Honig v. Doe*, 484 U.S. 305, 326-27 (1988) (also noting that exhaustion may be excused if it would futile or inadequate); *McCormick v. Waukegan School Dist. No. 60*, 374 F.3d 564, 568 (7th Cir. 2004) (allowing bypass of administrative procedures that were inadequate for particular injuries alleged).

---

[3]Most activity under the IDEIA relies upon parents to act on behalf of their children.  When a child turns 18 and has not been determined to be incompetent under state law, however, the rights of the parents are transferred to the child. See 20 U.S.C. § 1415(m).  Sandlin had reached age 18 before this suit was filed.

Plaintiff Sandlin asserts claims only under the Americans with Disabilities Act, the Rehabilitation Act, and state tort law.  He does not assert any claim for relief under the IDEIA.  SCSC contends, however, that Sandlin's federal claims necessarily arise under the IDEIA, so that he was required to use and exhaust the act's administrative remedies before filing this suit.  As its lead authority for this proposition, SCSC relies on the Seventh Circuit's unpublished decision in *C.T. v. Necedah Area School District*, 39 Fed. App'x 420 (7th Cir. 2002), and criticizes Sandlin for relying on cases from other circuits.  The problem for SCSC is that its reliance on *C.T.* is flatly contrary to Seventh Circuit Rule 32.1.  With limited exceptions that do not apply here, that rule prohibits citation of unpublished orders issued before January 1, 2007.  *C.T.* simply is not binding and is not even available as a precedent here.  There is no point in arguing *C.T.*, and doing so is prohibited by the Seventh Circuit itself.

The IDEIA and it predecessors contain a savings clause with an interesting wrinkle regarding exhaustion of administrative remedies.  The current version reads:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C. § 12101 *et seq.*], title V of the Rehabilitation Act of 1973 [29 U.S.C. § 791 *et seq.*], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws *seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.*

20 U.S.C. § 1415(*l*) (emphasis added).  A very similar version was codified as 20 U.S.C. § 1415(f) when the Seventh Circuit decided a published case that is available for citation and that addressed an issue very similar to the exhaustion issue presented here.  In *Charlie F. v. Board of Education of Skokie School Dist. No. 68*, 98 F.3d 989 (7th Cir. 1996), a child was receiving special education services under the IDEIA's predecessor.  His parents filed suit under the ADA, the Rehabilitation Act, and the Fourteenth Amendment to the Constitution (under 42 U.S.C. § 1983).  They sought only money damages for harm caused when the child's teacher presided over gripe sessions of her fourth grade class that focused other students' anger and frustration on the child with disabilities.  The plaintiffs in *Charlie F.* did not seek relief under the IDEIA's predecessor.

The defense argued that exhaustion of remedies under the IDEIA's predecessor was required.  Relying on the plain language of the savings clause, plaintiffs argued that because the relief they sought under the Fourteenth Amendment, the ADA, and Rehabilitation Act was not available under the IDEA, the exhaustion of administrative remedies requirement did not apply.  The Seventh Circuit disagreed.  The court reasoned that the parents' choice of preferred remedies was not controlling.  98 F.3d at 991-92.  Because the facts alleged by the plaintiffs would have entitled them to relief under the IDEA, including compensatory educational services and related services, relief was actually available under the IDEA, so the exhaustion requirement applied.  *Id.* at

992.  The appellate court ordered dismissal for failure to exhaust administrative remedies.

Under *Charlie F.*, therefore, Sandlin's desire to pursue only monetary damages does not avoid the requirement that he exhaust administrative remedies available under the IDEIA, even though he claims not to seek relief under that statute.  But recall that in this case, SCSC never treated Sandlin as a child with disabilities needing special educational help. When SCSC expelled Sandlin, the school considered internally whether Sandlin should be protected by the IDEIA, but it never told Sandlin or his parents that the IDEIA was even an issue.  The school never informed Sandlin or his parents that they had any rights under the IDEIA, including the right to further administrative processes to protect his rights.

In other words, SCSC is arguing here that before Sandlin could file this lawsuit, he was required to pursue administrative remedies he knew nothing about under a law that he did not want to rely upon.  While not quite as confounding as the dilemma confronting the fictional Josef K. in *The Trial* (Sandlin seeks relief and does not risk punishment here), the defense argument certainly has a whiff of the Kafkaesque.

It is well established that the exhaustion requirement does not apply when the administrative remedies would be futile or if the plaintiffs were not given "full notice of their procedural rights" under the statute.  *Covington v. Knox County*

*School System*, 205 F.3d 912, 917 (6th Cir. 2000), citing *Honig v. Doe*, 484 U.S. 305, 326-27 (1988), and *Crocker v. Tennessee Secondary School Athletic Ass'n*, 873 F.2d 933, 936 (6th Cir. 1989); see generally *McCormick v. Waukegan School Dist. No. 60*, 374 F.3d at 568.  The burden is on the plaintiff to show futility or inadequacy of the administrative procedures.  *Covington*, 205 F.3d at 917.  But school officials who seek to rely on the procedures of the IDEIA have an obligation to inform a child's parents of their rights under that law if they want to use those procedures as a defense.  *E.g.*, *Covington*, 205 F.3d at 917; *Doe v. Maher*, 793 F.2d 1470, 1491 (9th Cir. 1986) (where school officials unilaterally changed child's educational program and failed to notify child's grandparents of the change or the administrative procedures available for further review, court would not require exhaustion of those administrative remedies), quoting *Christopher T. v. San Francisco Unified School Dist.*, 553 F. Supp. 1107, 1117 (N.D. Cal. 1982) (administrative review procedures "were intended to protect parents and children whom the responsible local agency has treated unfairly; they were not intended . . . to insulate the agency from federal court review of its conduct").

That reasoning applies squarely to this case.  SCSC never treated Sandlin as a child protected by the IDEIA and never notified him or his parents that they had any rights to further review of school decisions under the IDEIA.  Under these circumstances, Sandlin was not required to exhaust those unknown administrative remedies.

To avoid this conclusion, SCSC argues that Sandlin had actual notice of his rights under the IDEIA because he is represented by an attorney in this lawsuit and because, in its answer to the complaint, SCSC asserted the affirmative defense of failure to exhaust administrative remedies.  Def. Reply Br. 8-9, citing *Christopher W. v. Portsmouth School Committee*, 877 F.2d 1089, 1097 (1st Cir. 1989).  In *Christopher W.*, the First Circuit held that exhaustion was required even though the school had not given proper notice of those procedures.  The court found that the plaintiff had actual notice of his rights because he had retained an attorney early in the controversy, more than six months before suit was filed.  The court also mentioned that the defendants had raised the defense in their answer and in other pleadings, see *id.*, but the early involvement of an attorney, when administrative procedures were still available and long before the lawsuit was filed, was clearly the critical factor.  SCSC also relies on *Amidon v. Michigan*, 2008 WL 723536, *13-*15 (E.D. Mich. March 17, 2008), in which the plaintiffs also had actual notice of their procedural rights before suit was filed.  In *Amidon*, the plaintiffs had filed a previous lawsuit and had been involved in earlier administrative proceedings with the school district.  SCSC has not cited any case holding that pleading an affirmative defense in an answer in a lawsuit is sufficient to comply with the school's statutory to give notice of those procedural rights under 20 U.S.C. § 1415(c) and (d).  Yet that is all that SCSC has shown in this case.

If a school expects students and their parents to exhaust their administrative remedies under the IDEIA, it needs to take the simple step of notifying parents and students of their procedural rights, as the IDEIA itself requires.  Because of this lack of notice, Sandlin is excused from the requirement that he exhaust any administrative remedies under the IDEIA.

IV.   *Rehabilitation Act and ADA Claims*

We turn to the merits of the claims Sandlin actually asserts.  The Americans with Disabilities Act was passed to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  The Rehabilitation Act was passed to empower "individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society." 29 U.S.C. § 701(b).  For students at schools receiving federal funds, the ADA and the Rehabilitation Act operate almost identically.  See *Rothman v. Emory University*, 123 F.3d 446, 451 (7th Cir. 1997).  One key difference between the two statutes is that Congress passed the Rehabilitation Act under its Spending Clause power and the ADA under the Commerce Clause.  See *Stanley v. Litscher*, 213 F.3d 340, 343-44 (7th Cir. 2000) (holding that Rehabilitation Act claims against state were not subject to Eleventh Amendment defense, though ADA claims were).  Both statutes require a claimant to establish three things:  (1) he is disabled, (2) he is "otherwise qualified" to participate in the program, and (3) he is being excluded

because of his disability. *Washington v. Indiana High School Athletic Ass'n*, 181 F.3d 840, 843, 845 & n.6 (7th Cir. 1999).

Sandlin claims that SCSC violated Title II of the ADA and the Rehabilitation Act by discriminating against him because of his disability. Sandlin asserts that he is disabled, he is "otherwise qualified," and he suffered discrimination because of his disability. Sandlin alleges the following acts of discrimination: SCSC required him to stay home for ten days after his August 24, 2005 seizure; SCSC did not take the initiative in training its staff on how best to deal with Sandlin's epilepsy; SCSC did not call Sandlin to inform him that he could return to school; SCSC allowed too many people to be in the nurse's office during the September 28, 2005 seizure; and SCSC called the police during the September 28, 2005 seizure despite the agreed section 504 plan that specified the police should not be called. In response SCSC argues that Sandlin was not disabled and did not suffer discrimination because of his condition. The court finds as a matter of law that Sandlin did not suffer intentional discrimination and therefore need not, for purposes of summary judgment, determine if he was disabled.

ADA and Rehabilitation Act claims require a plaintiff to show either intentional discrimination or failure to provide reasonable accommodations for a disability. See *Beth B. v. Van Clay*, 211 F. Supp. 2d 1020, 1035 (N.D. Ill. 2001) (granting summary judgment for the defendant on ADA and Rehabilitation Act claims because the plaintiff did not show that the defendant acted in bad faith).

Assuming that Sandlin's epilepsy qualifies as a disability, the question to be resolved on summary judgment is whether SCSC provided Sandlin with reasonable accommodations for his epilepsy. However, there can be a debate as to what are reasonable accommodations, and a student will not always be able to have every accommodation that he requests. See *Schmidt v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 342, 344 (7th Cir. 1996) (affirming district court's grant of summary judgment for defendant on plaintiff's ADA employment claim because defendant offered a reasonable accommodation but plaintiff refused it, preferring a different accommodation of his disability). ADA and Rehabilitation Act discrimination claims against schools are not suitable vehicles for "educational malpractice" claims. See *Beth B.*, 211 F. Supp. 2d at 1035.

Sandlin argues that "a particular accommodation is inherently unreasonable and discriminatory if it does not help the student with a disability toward his goal." Pl. Br. 17. Sandlin cites *Wynne v. Tufts Univ. School of Medicine*, 976 F.2d 791 (1st Cir. 1992), but the case does not support such a sweeping conclusion. In *Wynne* a medical student failed many of his first year classes. The school allowed the student to retake his first year courses; he passed all but two. The school allowed him to take those two classes a third time, but he still failed one. The student then flunked out of school. The student later said he wanted to take his final two examinations orally instead of using the multiple choice format, but the school refused. The district court granted summary judgment for the school, and the First Circuit affirmed. The First Circuit found that the school

had not turned a blind eye to the student's problems and had not failed to make a reasonable accommodation. *Id.* at 795. The First Circuit held that the school made reasonable accommodations for the student even though those accommodations did not prevent him from flunking out of medical school.

The Eighth Circuit has dealt with claims similar to Sandlin's and has devised a useful framework for determining if a school has discriminated against a student when making a reasonable accommodation. In *Hoekstra v. Independent School Dist. No. 283*, 103 F.3d 624 (8th Cir. 1996), the plaintiff student had a condition that made it difficult to walk up stairs, so she requested a key to the elevator. Her request came no later than March 1994, the school came up with a plan for giving her the key in April 1994, and the school gave her key in June 1994. The student claimed the delay in giving her the key violated the ADA. The district court dismissed the student's claim. The Eighth Circuit affirmed the dismissal because the plaintiff had failed to show that the school acted in "bad faith" or that the delay was a "gross misjudgment." *Id.* at 626. In *Hoekstra*, the Eighth Circuit applied to the ADA its earlier reasoning under the Rehabilitation Act, finding that a gross misjudgment/bad faith standard properly balanced:

> the rights of handicapped children, the responsibilities of state educational officials, and the competence of courts to make judgments in technical fields. So long as the state officials involved have exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals, we cannot believe that Congress intended to create liability under § 504.

Monahan v. State of Nebraska, 687 F.2d 1164, 1171 (8th Cir. 1982) (affirming dismissal of plaintiff's Rehabilitation Act claim because the defendant did not allege a gross misjudgment or action in bad faith), followed in *Hoekstra*, 103 F.3d at 626-27.

The Seventh Circuit has not applied the gross misjudgment/bad faith standard, but the standard is consistent with Supreme Court and Seventh Circuit rulings in cases where the plaintiff seeks only compensatory damages.   In *Timms v. Metropolitan School Dist. of Wabash County*, 722 F.2d 1310 (7th Cir. 1983), the Seventh Circuit addressed *Monahan* in a footnote in the course of affirming dismissal of a Rehabilitation Act claim because the plaintiff had failed to exhaust her remedies under the predecessor of the IDEIA:  "the strong language of section 504, which prohibits 'exclusion,' 'denial of benefits,' and 'discrimination,' has suggested to one court that the misconduct complained of must be deliberate or a gross misjudgment, at least in the context of educational judgments."  *Id.* at 1318 n.4. The Seventh Circuit then noted that the Supreme Court had weakened the *Monahan* gross misjudgment/bad faith standard, at least in cases seeking equitable relief.

The Supreme Court, in *Guardians Ass'n v. Civil Serv. Comm'n of City of New York*, indirectly limited the *Monahan* decision.   463 U.S. 582, 607 (1983).  To understand how, it is necessary to understand the remedies provisions of the ADA, Rehabilitation Act, and Title VI of the Civil Rights Act of 1964.  The ADA

adopts the remedies available under the Rehabilitation Act.  42 U.S.C. § 12133.
The Rehabilitation Act in turn adopts the remedies available under Title VI of the
Civil Rights Act of 1964.   29 U.S.C. § 794(a).   *Guardians* addressed remedies
under Title VI and held that "discriminatory intent is not an essential element of
a Title VI violation."  463 U.S. at 607.  The Supreme Court held that to prevail in
a suit *for equitable remedies*, the plaintiff need not show intentional
discrimination.  *Id.*  The Supreme Court noted, without deciding, that a plaintiff
might be required to prove intentional discrimination to recover compensatory
damages.  *Id.* at 597.  The Supreme Court drew the distinction between equitable
and compensatory relief because Title VI was enacted under the Spending Clause.
*Id.* at 596-97.  A state's receipt of federal funds under the Spending Clause is
consensual.  Title VI did not explicitly create a private cause of action.  The
Supreme Court favored equitable remedies because a state could choose either to
comply with a court ruling or to refuse the federal funding.  With proof of
intentional discrimination, however, the Court suggested that compensatory
damages could be allowed.  *Id.*

In *Timms*, the Seventh Circuit read *Guardians* as limiting *Monahan* to cases
seeking compensatory damages, as Sandlin seeks here.  See 722 F.2d at 1318 n.4.
If the plaintiff in a Rehabilitation Act claim seeks compensatory damages, the
plaintiff must show intentional discrimination; if the plaintiff seeks equitable
remedies, the plaintiff is not required to show intentional discrimination.  The
*Monahan* requirement of proof of intentional discrimination should not apply when

the plaintiff seeks equitable remedies. But Sandlin is seeking only monetary damages, so the dicta in *Timms* and *Guardians* indicate that he needs to show intentional discrimination. The *Monahan* gross misjudgment/bad faith standard works well in a situation like this case, where the plaintiff must show intentional discrimination.

Judge Moran of the Northern District of Illinois applied this gross misjudgment/bad faith standard to ADA and Rehabilitation Act claims in *Beth B v. Van Clay.* See 211 F. Supp. 2d at 1035 (discussed above). Under this standard, the undisputed facts show that SCSC did not discriminate intentionally against Sandlin. The first instance of possible discrimination by SCSC came when it asked Sandlin to stay home from school. Sandlin had a seizure on Wednesday, was helicoptered to Cincinnati that day, and was back in school by Friday. On Friday the school convened a section 504 plan meeting. At the end of the meeting, Principal Marshall told both Sandlin and his mother that Sandlin was going to need to leave school until the staff was properly trained. During the time Sandlin was out of school, the school did not take the initiative in training staff or in contacting Sandlin to let him know it was ready for him to return to school. But the undisputed evidence shows that such training was provided and Sandlin returned to school after his mother called. Sandlin has offered no evidence to show that ten days was an unreasonable amount of time to train the school staff. The only evidence entered is that Mr. Marshall was concerned with safety. After ten days, when Sandlin's mother contacted the school, he was told he would be

welcome back immediately.   With the evidence presented to the court, no reasonable jury could conclude that Sandlin's absence was either the result of a gross misjudgment or done in bad faith.  For the ten days after the first seizure at the high school, no reasonable jury could find intentional discrimination that violated the ADA or the Rehabilitation Act.

During Sandlin's second seizure on September 28th, the court assumes there were too many people in the nurse's office.  A school secretary and some other office workers were in the room, but their presence was not a part of the section 504 plan.  Sandlin has offered no evidence to show that the presence of extra people in the room was either done in bad faith or was a gross misjudgment.

While the paramedics wheeled Sandlin out of the school, Officer McCoy ran in, grabbed Sandlin's arm, and allegedly injured him.  The section 504 plan said that the police were not to be called.  Superintendent Caddell had decided after the section 504 plan meeting that the school district would not agree to this condition, and he would have the school call the police for safety.  Sandlin's parents were not informed of this change.

Although there is room to debate whether a unilateral change to a section 504 plan is appropriate, Sandlin has offered no evidence to show that it was a gross misjudgment to call the police.  No evidence shows that school officials should have known it would be unreasonable for schools to call the police during

medical emergencies. Caddell's reasoning was that because of the unintended violence of Sandlin's past seizures, the police could help protect the safety of staff and other students. Graziani Dep. 69. In fact, a teacher had been injured during Sandlin's August 2005 seizure. *Id.* at 36. Because there is no evidence of gross misjudgment or bad faith in this decision, no reasonable jury could conclude that calling the police was a violation of the ADA or the Rehabilitation Act. There is no genuine issue of material fact that could allow a jury to conclude that SCSC intentionally discriminated against Sandlin in violation of the ADA or the Rehabilitation Act. Summary judgment is granted to SCSC on these claims.

V.     *Indiana Tort Claims*

Sandlin alleges two Indiana tort claims for negligence. The first claim is that SCSC was negligent when it called the police during Sandlin's September 2005 seizure. The second is that SCSC was negligent in failing to ensure that Sandlin completed school. In Indiana, the tort of negligence requires proof of three elements: "(1) a duty on the part of defendant in relation to the plaintiff; (2) failure on the part of defendant to conform his conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff resulting from that failure." *Norman v. Turkey Run Community School Corp.*, 411 N.E.2d 614, 616 (Ind. 1980) (affirming trial court's grant of summary judgment for defendant because there was no issue of material fact where two children ran into each other on a school playground). There are three questions of law a court must answer

for the tort of negligence:  (1) does the law recognize any duty on the behalf of a particular defendant to a particular plaintiff, (2) what standard is imposed once a duty is recognized, and (3) is the evidence sufficient, as a matter of law, to find the plaintiff has established the elements of negligence?  *Id.* at 616-17.  This court chooses to exercise supplemental jurisdiction because the tort claims and federal claims involve the same operative facts.  28 U.S.C. § 1367(a).

A.    *Reasonable Care for Safety of Children*

Indiana common law "recognizes a duty on the part of school personnel to exercise ordinary and reasonable care for the safety of the children."  *Miller v. Griesel*, 308 N.E.2d 701, 706 (Ind. 1974).  Schools are not insurers and are not to be held to a strict liability standard for injuries to their students.  *Norman*, 411 N.E.2d at 617.

Sandlin argues that SCSC violated its duty to provide him a safe school environment by calling the police to the school during his September 2005 seizure.  Principal Marshall had agreed during the section 504 plan meeting that the police would not be called during a seizure.  Superintendent Caddell had overruled that decision out of a concern for the safety of other students and staff. Following Caddell's decision, the school called the police when Sandlin began

having a seizure.  Officer McCoy then rushed into the school, grabbed Sandlin's arm, and injured him.[4]

Sandlin has introduced no evidence showing that Superintendent Caddell acted unreasonably by directing that the police be called.  The only evidence is that the police were called because of a safety concern, and that concern was reasonable.  School officials need to exercise ordinary and reasonable care for the safety of *all* the children and staff.  *Norman*, 411 N.E.2d at 617.  Sandlin had been violent, beyond his control, during the seizure a month earlier and a teacher had suffered an injury.  Sandlin has offered no evidence that would allow a reasonable jury to decide it was unreasonable for the police to be called.  In fact, as a matter of public policy, it is hard to imagine circumstances in which a court could consider calling police for help to be a breach of a legal duty to anybody.

Sandlin argues that the doctrine of *res ipsa loquitur* ("the thing speaks for itself") applies in this case.  The doctrine is a rule of evidence that allows an inference of negligence to be drawn from circumstantial evidence.  *Rector v. Oliver*, 809 N.E.2d 887, 889 (Ind. App. 2004).  The doctrine requires proof "(1) that the injuring instrumentality was within the exclusive management and control of the defendant or its servants, and (2) that the accident is of the type that does not

_____

[4]At least that is what this court must assume on this record for purposes of summary judgment.  Neither the town nor Officer McCoy is a party to this suit.

ordinarily happen if those who have the management and control exercise proper care." *Id.* at 890; accord, Restatement (Second) of Torts § 328(d) (1965).

The doctrine does not apply here. First, the physical injury was inflicted not by school personnel but by a police officer not under the school's control. Second, Sandlin has offered no evidence to show that people are not typically injured during seizures in the absence of negligence on the part of others. In fact, Sandlin suffered an injury during his first epileptic seizure, when he fell to the ground and hurt his chin. SCSC is entitled to summary judgment on Sandlin's negligence claim based on the injury to his shoulder.

B.     *Negligent Failure to Provide an Education*

Sandlin claims that SCSC was negligent because it failed "to make sure he finished school." Pl. Br. 19. The Indiana Constitution requires "the General Assembly to encourage . . . a general and uniform system of Common Schools." Ind. Const. art. 8, §1. The constitutional provision does not require the state to ensure that every student graduates. Indiana law allows for students to be suspended and even expelled if proper procedures are followed. See Ind. Code § 20-33-8-8.

It is not at all clear that Indiana law would recognize the novel tort Sandlin asserts in this claim, but it certainly fails on a simpler issue. Tort claims against

government entities, including schools, differ from most other tort claims in one significant aspect:  the common law defense of contributory negligence applies. Ind. Code § 34-51-2-2; *Funston v. School Town of Munster*, 849 N.E.2d 595, 598 (Ind. 2006) (affirming trial court's grant of summary judgment to defense where plaintiff sued school district after he fell off bleachers, and he was determined to be contributorily negligent).  If Sandlin's own negligence or fault was a proximate cause of his injury, his claim is barred.  See *Funston*, 849 N.E.2d at 598.

Sandlin has offered no evidence to show that the ten days he was asked to stay home after his August 2004 seizure was an unreasonable amount of time. The school's treatment of Sandlin could have been a factor in his other behavior problems.  However, Sandlin argued with the teacher voluntarily, punched the other student voluntarily, and withdrew from the school voluntarily.  To find the school liable for negligence, Sandlin could not have been at fault.  No reasonable jury could find that Sandlin's own fault was not, at a minimum, a contributing factor to his not receiving an education.  *Funston* held that if the plaintiff's own negligence is a proximate cause of his damage, he is completely barred from recovery.  849 N.E.2d at 600.  SCSC is entitled to  summary judgment on this claim, as well.

VI.    *Aggravation of the August 2005 Seizure*

Sandlin has argued that the combination of teachers and paramedics restraining him aggravated his August 2005 seizure and caused him to go into a "shock seizure." Sandlin has offered no evidence that would be admissible under the Federal Rules of Evidence to support this assertion. Sandlin has not responded to SCSC's expert interrogatories. Sandlin has not disclosed any expert testimony  to support this assertion. The court did not consider Sandlin's assertion that SCSC aggravated his seizure or caused him to go into a "shock seizure" and considers this claim waived.

VI.   *Sandlin's Request for Summary Judgment*

In the conclusion of his response to SCSC's motion for summary judgment, Sandlin said that the court should both deny SCSC's motion for summary judgment and grant him summary judgment. Sandlin did not file a separate motion for summary judgment, and his request did not comply with Local Rule 56.1, which is intended to ensure that the non-moving party has a fair opportunity to respond. Sandlin's request for summary judgment is denied.

*Conclusion*

The undisputed facts show that a reasonable fact finder could not find for Sandlin on his ADA, Rehabilitation Act, or Indiana tort claims. SCSC's motion for summary judgment is granted on those claims. The briefing of these claims indicates that it is at least possible Sandlin might have a right under the IDEIA

to seek compensatory education if he can show that his rights under that statute were violated.  (The IDEIA does not require proof of intentional discrimination.)  The court has held that Sandlin was not required to exhaust administrative remedies under the IDEIA but expresses no opinion as to other issues that might arise under the act.  The court will not enter final judgment at this time but will give Sandlin 30 days, until September 16, 2009, in which to file an amended complaint asserting such a claim, if he wishes to do so.  If he does not do so, the court will enter a final judgment dismissing the action as he has pled it.

So ordered.

Date: August 17, 2009

_____

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

John William Emry Jr
johnemrylaw@att.net

Edward W. Hearn
JOHNSON & BELL
hearne@jbltd.com

Susan Kathleen Swing
JOHNSON & BELL, LTD
swingS@jbltd.com